# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

HIRSCHBACH MOTOR LINES, INC.,

    Plaintiff,

vs.

LEXINGTON INSURANCE COMPANY,

    Defendant.

No. C22-1002-LTS-MAR

**ORDER**

## I. INTRODUCTION

This case is before me on cross-motions (Docs. 22, 23) for summary judgment. On February 23, 2023, the parties submitted a joint motion (Doc. 18) to submit the case to the court, stating that they believed this case could be decided by the court based on stipulated facts, briefing and argument. The Honorable Mark A. Roberts, United States Magistrate Judge, granted the motion and set a schedule for filing briefs, a joint stipulation of facts, a joint appendix and resistances. Doc. 19.

Pursuant to this schedule, Defendant Lexington Insurance Company (Lexington) filed a motion (Doc. 22) for summary judgment, along with a brief in support (Doc. 22-1) and an appendix (Doc. 22-2). Plaintiff Hirschbach Motor Lines, Inc. (Hirschbach), filed its own motion (Doc. 23) for summary judgment with a brief in support (Doc. 23-1), an appendix (Doc. 23-3) and a declaration (Doc. 23-4). Hirschbach filed a resistance (Doc. 26) to Lexington's motion and Lexington filed a resistance (Doc. 25) to Hirschbach's motion. The parties also submitted a joint statement (Doc. 23-2) of facts.

## II. PROCEDURAL HISTORY

On December 1, 2021, Hirschbach filed a petition (Doc. 2) against Lexington in the Iowa District Court for Dubuque County. Hirschbach asserts two claims: Declaratory

Judgment (Count 1) and Breach of Contract (Count 2). Doc. 2 at 4-6. Hirschbach seeks compensatory and consequential damages, as well as costs, pre- and post-judgment interest, litigation costs and any further relief the court deems just. *Id.* at 5-6. In its motion for summary judgment, Hirschbach clarifies that it is seeking "coverage in the amount of $163,264.45, the value of the adulterated cargo above the Policy's $100,000 deductible." Doc. 23 at 3.

On January 14, 2022, Lexington removed the case to this court based on diversity of citizenship jurisdiction. Doc. 1. In its answer (Doc. 5), Lexington asserts that it is not responsible for special and/or consequential damages, that Hirschbach's losses are excluded from coverage under the insurance policy and that Hirschbach failed to mitigate its damages.

### III. RELEVANT FACTS

The parties filed a joint statement (Doc. 23-2) of material facts, which are summarized below.

Lexington issued Inland Marine Policy No. 011144451, effective from August 19, 2019, to August 19, 2020 (the Policy), to Hirschbach. Doc. 23-2 at 1 ¶ 3. The Policy included an FDA Food Safety Modernization Act Coverage Extension Endorsement (FSMA Endorsement), which modifies the Motor Truck Cargo Liability Coverage Part of the Policy. *Id.* ¶ 3.

On July 21, 2020, Hirschbach, via its independent contractor driver, Christopher Winn, picked up a load of boxed chilled beef goods (the Cargo) from Creekstone Farms Premium Beef, located in Arkansas City, Kansas, for delivery to the FPL/Red Kingfisher (FPL) warehouse located in Thomasville, Georgia. *Id.* at 2 ¶ 5. The warehouse was owned by Walmart. *Id.* Pursuant to the Truckload Transportation Agreement (Agreement) between Walmart and Hirschbach, dated August 13, 2013, Hirschbach was required to confirm that the trailers were sealed for all Walmart shipments and record the seal number on the Bill of Lading at origin. *Id.* ¶ 6. According to the Agreement, if a

2

trailer is not sealed upon delivery, or if the seal does not match the number reflected on the Bill of Lading, this would be deemed "prima facie evidence" for any claim filed by Walmart against Hirschbach for cargo loss. *Id.*

On July 22, 2020, Winn arrived at the Walmart warehouse after business hours to deliver the Cargo. *Id.* ¶ 9. When no warehouse worker could be located, Winn broke the seal on the back of the trailer, opened the trailer's doors, backed the trailer to a warehouse dock, unhooked the trailer from the tractor, placed the Bill of Lading in the warehouse bill box and left the warehouse. *Id.* ¶ 10. The trailer doors stayed open until the following morning, when the warehouse workers returned to the warehouse and discovered the trailer, with the doors open and the broken seal inside. *Id.* at 3 ¶ 11.

On July 23, 2020, James Burmeister, Food Safety and Quality Assurance Manager for FPL, was responsible for making the decision to accept or reject the Cargo. *Id.* ¶ 12. Burmeister inspected the trailer and the Cargo. *Id.* ¶ 13. Based on Burmeister's investigation, he made the decision to reject the Cargo and wrote on the Bill of Lading: "Rejected – Broken Seal. Door Opened. TRAILER in Door 20." *Id.* ¶ 14. Burmeister testified that he rejected the shipment for the reasons listed on the Bill of Lading and was not aware of any other reasons for rejecting the Cargo. *Id.* ¶ 15. He further testified that that if a trailer is received with a broken seal, or if the seal number does not match the original Bill of Lading, it is disqualified from being received and that FPL does not perform any further inspections of the shipment. *Id.* ¶ 16. Burmeister testified that his investigation into the Cargo ended after he noticed the seal was broken on the shipment. *Id.* ¶ 17.

On July 23, 2020, at 8:15 A.M., Jesse Whitman, Shipping and Receiving Manager for FPL, wrote: "Load rejected due to driver opening and backing in his trailer when no one checked the seal." *Id.* at 4 ¶ 18. Burmeister testified that the decision to reject a shipment is ultimately Burmeister's own decision. *Id.* ¶ 19. Later on July 23, 2020, Jeff Necessary, Walmart Supply Chain Manager, wrote that the Cargo had been rejected because the driver opened the door. *Id.* at 5 ¶ 20. Walmart then deducted the value of

3

the Cargo, $263,264.55, from Hirschbach's freight bills and refused to pay for the Cargo. *Id.* ¶ 21. Hirschbach retained Custard Insurance Adjusters (Custard) to inspect the trailer and the Cargo. The adjuster did not do anything to determine the condition of the beef inside the boxes. *Id.* ¶¶ 22, 23.

On July 24, 2020, Hirschbach submitted a claim to Lexington for $163,264.45 to recover the value of the rejected Cargo under the Policy (in excess of the Policy's $100,000 deductible). *Id.* at 6 ¶ 24. Lexington's claim adjuster, Winston Adams of McClarens, found that the refrigeration unit of the trailer was operating properly and the Cargo had been properly refrigerated and had maintained proper temperature from the time the load was picked up through the time the load was rejected and beyond. *Id.* ¶ 25. Adams further found that the Cargo's packing materials were dry on all surfaces and that there were no signs of delamination or moisture condensation. *Id.* Finally, Adams determined that there was no unpleasant odor emanating from the Cargo and there were no signs of crystallization of the Cargo. *Id.*

Lexington denied Hirschbach's claim because "[t]here appears to be no evidence that the Cargo sustained 'accidental, external, direct physical destruction, theft or damage' and that the sole reason that the cargo owner is rejecting the Cargo is due to the seal being broken by the Hirschbach driver." *Id.* ¶ 26*;* Doc. 23-3 at 137. Hirschbach disagreed with the denial. Doc. 23-2 at 6 ¶ 27. In an email sent to Lexington on August 31, 2022, Hirschbach's general counsel Brian Kohlwes wrote that FPL rejected the Cargo for two additional reasons: the driver opening the doors and not allowing anyone to inspect the seal. Doc. 23-3 at 138-39. Kohlwes testified that Walmart did not notify Hirschbach that the Cargo was adulterated. Doc. 23-2 at 6 ¶ 28.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

4

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof,

5

then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996). On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998).

## V. ANALYSIS

### A. The Parties' Motions

#### 1. Lexington's Motion

Lexington argues that it is entitled to summary judgment on both counts. First, it argues that the Cargo did not sustain "Direct Physical Loss or Damage" as required by the insuring agreement of the Policy. Doc. 22-1 at 6. Lexington next argues that one or more of the Policy's exclusions applies to bar coverage for the loss of the Cargo, specifically exclusions that exclude coverage for "consequential loss or damage" or coverage for damages due to "loss of use." *Id.* at 8-9. Finally, Lexington argues that the Policy's FSMA Endorsement does not provide coverage for the rejected Cargo because the Cargo was not "deemed adulterated" pursuant to the FDA's FMSA regulations as required by the FSMA endorsement, and even if the Cargo was deemed

6

adulterated, it was rejected solely due to seals that were not intact – a reason that falls into an exclusion under the FSMA Endorsement. *Id.* at 10-15.

### 2. *Hirschbach's Resistance*

Hirschbach first argues that Lexington's arguments as to whether the Cargo sustained "Direct Physical Loss or Damage" are irrelevant and instead focuses on the Policy's FSMA endorsement. Doc. 26-1 at 3. Hirschbach argues that the FSMA Endorsement provides coverage for cargo deemed adulterated under FSMA regulations and that, because the Cargo was rejected after it was deemed adulterated pursuant to FSMA regulations, the FSMA Endorsement covers its claim. Doc. 23-1 at 5-9. Hirschbach denies that the Cargo was rejected solely because of a broken seal, such that the exception Lexington relies on does not apply. *Id.* at 12-13.

### 3. *Hirschbach's Motion*

Hirschbach notes that under Iowa law, insurance contracts are to be construed in the light most favorable to the insured. Doc. 23-1 at 4. Hirschbach next advances the same argument from its resistance that the FSMA Endorsement covers the Cargo because the Cargo was deemed adulterated pursuant to FSMA regulations. Doc. 23-1 at 5-8. Hirschbach then details the multiple reasons for which the Cargo was rejected. *Id.* at 6-7. Finally, Hirschbach argues that excluding the Cargo from coverage under the FSMA Endorsement results in that endorsement providing only illusory coverage. *Id.* at 8-9.

### 4. *Lexington's Resistance*

Lexington points out that Hirschbach does not dispute that the Cargo did not sustain "Direct Physical Loss," and thus is not covered under the Motor Truck Cargo Liability Coverage Form. Doc. 25 at 2. Lexington next argues that FPL did not deem the Cargo to be adulterated, meaning the FSMA Endorsement was never triggered. *Id.* at 2-3. Lexington further argues that even if the FSMA Endorsement was triggered, the

"seals that are not intact" exception would apply, as the only evidence of adulteration was due to FPL determining that the seal had been broken. *Id.* at 6-7. Finally, Lexington argues that the FSMA Endorsement does not provide illusory coverage. *Id.* at 7-8.

## *B. Analysis*

I have considered both parties' motions and resistances on an individual and separate basis in accordance with Federal Rule of Civil Procedure 56. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998). However, because the arguments made in the parties' respective motions for summary judgment and resistances are intertwined, I will discuss the arguments together.

As a preliminary matter, I agree with Hirschbach that the crux of this case is whether the FSMA Endorsement covers the rejected Cargo. In Iowa, "[t]he terms in the endorsement govern if the terms in the body of the policy conflict with the endorsement." *Boelman v. Grinnell Mut. Reinsurance Co.,* 826 N.W. 2d 494, 502 (Iowa 2013). In this case, the Policy itself does not cover cargo that did not sustain "direct physical loss or damage." Doc. 22-1 at 6. Nor does the Policy provide coverage for "loss of use" or "consequential loss or damage." *Id.* at 9. However, the FSMA Endorsement adds certain coverage for losses due to cargo being deemed adulterated pursuant to FSMA regulations. Doc. 26-1 at 4. The endorsement provides:

> **Adulterated Covered Property FDA Food Safety Modernization Act Coverage**
>
> We will pay for loss or damage to Covered Property as a result of the Covered Property being deemed adulterated pursuant to the Federal Drug Administration Food Safety Modernization Act Regulations.
>
> However, we will only pay for loss or damage to Covered Property due to:
>
> > 1. Accidental mechanical breakdown or failure of refrigeration or heating units installed in or on the Vehicle and/or Terminal, unless

8

> such breakdown or failure results from lack of power or fuel or erroneous temperature equipment settings or controls; or
>
> 2. Transportation or storage conditions, unless such conditions result from changes in temperature, any virus or disease, or seals that are not intact.

Doc. 23-3 at 72-73. Thus, the endorsement establishes a multi-step analysis for determining whether a loss to cargo is covered. The first step is to determine if the cargo was "deemed adulterated pursuant to the [FSMA] Regulations." If so, the endorsement provides coverage if the circumstances described in either paragraph 1 or paragraph 2 are present. Of relevance to this case, paragraph 2 provides coverage if the adulteration occurred as a result of "[t]ransportation or storage conditions," but only if those conditions did not arise due to "changes in temperature, any virus or disease, or seals that are not intact."[1] *Id*.

The initial question, then, is whether the Cargo was "deemed adulterated" under the FSMA regulations. Under 21 U.S.C. § 342(i),[2] food is deemed adulterated "[i]f it is transported or offered for transport by a shipper, carrier by motor vehicle or rail vehicle, receiver, or any other person engaged in the transportation of food under conditions that are not in compliance with regulations promulgated under section 350e of this section." 21 U.S.C. § 350e(b) authorized the FDA to create regulations that require

---

[1] I reject Hirschbach's argument that applying the FSMA Endorsement's exception for cargo rejected solely due to "seals that are not intact" would render the endorsement illusory. Under Iowa law, "for an exclusion to render a policy's coverage illusory, it must 'completely contradict the insuring provisions,' and 'eliminate all—or at least virtually all—coverage in a policy." *Henning Constr. Co. v. Phoenix Ins. Co.*, 570 F. Supp. 3d 670, 680 (S.D. Iowa 2021). By its express terms, there is a wide range of scenarios under which the FSMA Endorsement would cover loss to the Cargo. Applying that endorsement to exclude coverage for cargo that has been rejected solely due to "seals that are not intact" would not render the endorsement illusory.

[2] Lexington focuses on 21 U.S.C. § 342(a)(1), which relates to poisonous or insanitary ingredients in food. I find that the more relevant provision is 21 U.S.C. § 342(i), which applies to noncompliance with sanitary transportation conditions such as those at issue in this case. Therefore, I will discuss § 342(i), and its resultant regulations, rather than § 342(a)(1).

those "engaged in the transportation of food to use sanitary transportation practices prescribed by the Secretary to ensure that food is not transported under conditions that may render the food adulterated." 21 U.S.C. § 350e(b). Pursuant to this authority, the FDA promulgated Sanitary Transportation of Human and Animal Food regulations. 21 C.F.R. § 1.900 *et sq.* Section 1.902(a) states:

> The criteria and definitions of this subpart apply in determining whether food is adulterated within the meaning of section 402(i) of the Federal Food, Drug, and Cosmetic Act in that the food has been transported or offered for transport by a shipper, carrier by motor vehicle or rail vehicle, loader, or receiver engaged in transportation operations under conditions that are not in compliance with this subpart.

21 C.F.R. § 1.908(a)(6) states:

> If a shipper, loader, receiver, or carrier becomes aware of an indication of a possible material failure of temperature control or ***other conditions that may render the food unsafe during transportation, the food shall not be sold or otherwise distributed,*** and these persons must take appropriate action including, as necessary, communication with other parties to ensure that the food is not sold or otherwise distributed unless a determination is made by a qualified individual that the temperature deviation or other condition did not render the food unsafe.

(Emphasis added). A Food and Drug Administration (FDA) comment and response to 21 C.F.R. § 1.908(a)(6) provides further guidance:

> A broken cargo seal or any evidence of food cargo tampering would not necessarily create a per se presumption of adulteration. However, we advise persons engaged in transportation operations that, if such situations should arise, they should carefully evaluate the facts and circumstances of each incident, on a case-by-case basis, to determine whether the safety of the food cargo may have been compromised.

Food and Drug Administration, Comments and Response to Sanitary Transportation of Human and Animal Food Regulations, Comment 46, Fed. Reg. No. 2016-07330, Doc. FDA-2013-N-0013-0174 at 200092, 29111 (Apr. 5, 2016).

10

The parties dispute whether the Cargo was "deemed adulterated" under 21 C.F.R. § 1.908(a)(6). Hirschbach argues that § 1.908(a)(6) does not contain an inspection requirement for food to be deemed adulterated. Doc. 26-1 at 9. Instead, certain transportation conditions render food unsafe under § 1.908(a)(6), resulting in a finding of adulteration even without an inspection. *Id.* at 9-10. Lexington argues that food cannot be deemed adulterated under § 1.908(a)(6) unless a "qualified individual" inspects the food and finds it to be unsafe. Doc. 25 at 5. If this interpretation is correct, the FSMA Endorsement was not triggered because FPL did not inspect the Cargo and therefore did not reject it pursuant to FSMA regulations. *Id.* at 2-6.

I agree with Hirschbach's interpretation. Section 1.908(a)(6) does not require an inspection for food to be deemed adulterated, but rather requires inspection by a "qualified individual" to determine if food can be deemed safe for distribution *after* it has been subjected to potentially unsafe conditions. 21 C.F.R. § 1.908(a)(6) ("[T]hese persons must take appropriate action including, as necessary, communication with other parties to ensure that the food is not sold or otherwise distributed **unless** a determination is made by a qualified individual that the temperature deviation or other condition did not render the food unsafe.") (emphasis added); *see also Underwriters at Interest v. All Logistics Group, Inc.,* No. 1:19-cv-21889, 2020 WL 13220631, *5 (S.D. Fla. Oct. 15, 2020) (explaining that a food distributor "was prohibited from distributing the [food] unless a determination [was] made by a qualified individual that the temperature deviation did not render the food unsafe" under § 1.908(a)(6)).

This reading of the regulation more closely aligns with the plain reading of the regulation itself and with the goal of "ensur[ing] that transportation practices do not create food safety risks." ¶ 40,659 Sanitary Food Transport Guidelines Become Sixth FSMA Rule To Be Finalized, Food Drug Cosm. L. Rep. P 40659. Lexington's interpretation would give rise to a risk of food being deemed adulterated only after an inspection by a qualified individual, thus allowing potentially adulterated food to be distributed if no such inspection occurs. The more appropriate reading is that certain transportation conditions

11

create unsafe environments for food and that food subjected to those conditions may be distributed only after a "qualified individual" inspects the food and deems it to be unadulterated. Thus, at step one of the FSMA Endorsement analysis, I find, as a matter of law, that the Cargo was "deemed adulterated pursuant to the Federal Drug Administration Food Safety Modernization Act Regulations."

The next question is whether coverage for the loss to the Cargo is excluded by the conditions described in paragraph 2 of the FSMA Endorsement. As noted above, paragraph 2 provides coverage if the adulteration occurred as a result of "[t]ransportation or storage conditions," but only if those conditions did not arise due to "changes in temperature, any virus or disease, or seals that are not intact." Doc. 23-3 at 72-73. As a matter of law, the Cargo in this case was deemed adulterated due to "storage conditions." It is undisputed that the driver (Winn) opened the trailer's doors, backed the trailer to a warehouse dock, unhooked the trailer from the tractor and left the warehouse. Doc. 23-2 at 2 ¶ 10. The trailer doors stayed open until the following morning, when warehouse workers discovered the trailer, with the doors open and the broken seal inside. *Id.* at 3 ¶ 11. Burmeister, FPL's Food Safety and Quality Assurance Manager, then inspected the trailer and the Cargo and rejected the Cargo because the seal was broken and the doors were open. *Id.* ¶¶ 12-14. Under this express and unambiguous language of the endorsement, this constitutes adulteration due to "storage conditions."

As Lexington notes, however, paragraph 2 of the endorsement excludes coverage if the "storage conditions" resulted from "changes in temperature, any virus or disease, or seals that are not intact." There is no evidence that "changes in temperature" or "any virus or disease" caused the adulteration. If the broken seal ("seals that are not intact") was the sole cause of the adulteration, then Lexington's denial of coverage would be correct. However, the undisputed evidence demonstrates that the Cargo was rejected (i.e. deemed adulterated) for two reasons. Burmeister both wrote and testified that he rejected the Cargo because the seal was broken <u>and</u> the trailer's doors were open. Doc. 23-2 at 3, ¶¶ 14-16. Burmeister also testified that his investigation included reviewing

12

video footage that showed Winn opening the truck's doors, backing the truck into the wrong dock and leaving. Doc. 22-2 at 9. Thus, it is undisputed that the "storage conditions" that caused FPL to reject the Cargo included not only the broken seal, but the fact that the trailer's doors were opened, and remained open until the following morning.

As a matter of law, paragraph 2 of the FSMA Endorsement provides coverage for the loss to the Cargo and such coverage is not excluded by the "seals that are not intact" exception. As such, Hirschbach's motion for summary judgment must be granted and Lexington's motion for summary judgment must be denied.

## VI.　CONCLUSION

For the reasons set forth herein:

1.　Lexington's motion (Doc. 22) for summary judgment is **denied** in its entirety.

2.　Hirschbach's motion (Doc. 23) for summary judgment is **granted** in its entirety.

3.　Judgment **shall enter** in favor of Hirschbach and against Lexington in the amount of **$163,264.45**, along with interest as allowed by law and the costs of this action.

**IT IS SO ORDERED** this 4th day of March, 2024.

_____
Leonard T. Strand
United States District Judge